**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

---

James Broughton and Cheri Morris, Individually and as Members of JC Enterprises of Minnesota, LLC; and JC Enterprises of Minnesota, LLC, a Minnesota Limited Liability Company,

Plaintiffs,

v.

Hold Brothers On-Line Investment Services Inc., a Delaware Corporation,

Defendant.

Court File No. 01-CV-1128 (RHK/SRN)

**STIPULATION AND ORDER ALLOWING FILING OF SECOND AMENDED COMPLAINT AND MODIFYING BRIEFING SCHEDULE**

---

## STIPULATION

**WHEREAS** Plaintiffs filed a Complaint with this Court on June 22, 2001, and subsequently obtained service on Defendants Hold Brothers On-Line Investment Services Inc. (sued as On-Line Investments, Inc.) ("On-Line") and Gary Miller; and

**WHEREAS** the Court entered a stipulated Order on April 8, 2002, extending the time for the served Defendants to answer or otherwise plead to April 15, 2002; and

**WHEREAS** Plaintiffs served an Amended and Restated Complaint on April 11, 2002, before the filing or service of a pleading responsive to the initial Complaint; and

**WHEREAS** Plaintiffs' Amended and Restated Complaint inadvertently substituted an improper party Plaintiff in lieu of Plaintiff JC Enterprises of Minnesota, LLC; and

**WHEREAS** Defendant On-Line served and filed an Answer and Affirmative Defenses on April 29, 2002, within the time provided therefore by Federal Rule of Civil Procedure 15; and

FILED MAY 2 3 2002
RICHARD D. SLETTEN, CLERK
JUDGMENT ENTD______
DEPUTY CLERK______

**WHEREAS** Defendant Gary Miller served and filed an Answer and Affirmative Defenses on April 29, 2002, within the time provided therefore by Federal Rule of Civil Procedure 15; and

**WHEREAS** Defendant On-Line on April 29, 2002, served and filed a Motion to Compel Arbitration of All Claims Against it and to Stay Litigation Pursuant to the Federal Arbitration Act Or, in the Alternative, To Compel Arbitration of Plaintiff Morris's Claims and to Stay All Other Litigation Pending the Morris Arbitration Or, in the Alternative, To Dismiss Plaintiff JC Enterprises, Inc. from this Action and To Dismiss or Strike Plaintiffs' Punitive Damages Demand; and

**WHEREAS** Defendant Gary Miller on April 29, 2002, served and filed a Motion to Dismiss Plaintiffs' Amended Complaint for Lack of Personal Jurisdiction Or, in the Alternative, To Dismiss Plaintiffs' Amended Complaint for Improper Venue Or, in the Alternative, For Transfer Pursuant to 28 U.S.C. § 1404(a) Or, in the Alternative, To Dismiss Plaintiffs' Amended Complaint for Failure to State a Claim upon Which Relief Can Be Granted Or, in the Alternative, To Dismiss or Strike Plaintiffs' Punitive Damages Demand; and

**WHEREAS** pursuant to Local Rule 7.1 and Fed. R. Civ. P. 6(e) the time for Plaintiffs to respond to Defendants On-Line and Gary Miller's respective motions expires on May 23, 2002; and

**WHEREAS** Plaintiffs desire to serve and file a Second Amended Complaint, and to effectuate such service and filing before the hearing on Defendants On-Line and Gary Miller's respective motions; and

**WHEREAS** a copy of Plaintiffs' proposed Second Amended Complaint is attached hereto as **Exhibit A**; and

**WHEREAS** Plaintiffs' proposed Second Amended Complaint effectively dismisses served Defendant Gary Miller and unserved Defendant Paul Hutchins from this action; and

**WHEREAS** Plaintiffs' proposed Second Amended Complaint moots some, but not all, served and filed motions; and

**WHEREAS** Defendants are amenable to Plaintiffs' request for leave to amend their Amended and Restated Complaint and Plaintiffs' request to serve and file the Second Amended Complaint attached hereto as **Exhibit A**,

**IT IS HEREBY STIPULATED** by the parties, through their undersigned counsel of record, that the Court may, and is hereby requested, to enter the Order set forth below.

This Stipulation is made without prejudice to any party's expressly reserved right to object to the Court's jurisdiction over (any of) the Defendants.

**JOSEPH W. DICKER, P.A.**

By [signature]
Joseph W. Dicker (158264)
Suite 208
1406 West Lake Street
Minneapolis, MN 55408
(612) 827-5941
(612) 827-4175 (facsimile)

DATED: May 21, 2002

Donald E. Grossfield
165 N. Water Street
Rochester, NY 14604
(716) 423-0787
(716) 423-0109 (facsimile)

**ATTORNEYS FOR PLAINTIFFS**

DATED: May 21 , 2002

**LINDQUIST & VENNUM P.L.L.P.**

By ______________________
Daryle Uphoff (111831)
Marc A. Al (247923)
4200 IDS Center
80 South Eighth Street
Minneapolis, Minnesota 55402
(612) 371-3211
(612) 371-3207 (facsimile)

**ATTORNEYS FOR DEFENDANT GARY MILLER**

DATED: May 21 , 2002

**LINDQUIST & VENNUM P.L.L.P.**

By ______________________
Daryle Uphoff (111831)
Marc A. Al (247923)
4200 IDS Center
80 South Eighth Street
Minneapolis, Minnesota 55402
(612) 371-3211
(612) 371-3207 (facsimile)

**BRESSLER, AMERY & ROSS, P.C.**
David J. Libowsky, Esq. (admitted pro hac vice)
Dominick F. Evangelista, Esq. (admitted pro hac vice)
325 Columbia Turnpike
Florham Park, NJ 07932
P.O. Box 1980
Morristown, New Jersey 07962
(973) 514-1200

**ATTORNEYS FOR DEFENDANT HOLD BROTHERS ON-LINE INVESTMENT SERVICES INC.**

## ORDER

Based upon the above stipulation of the parties, **IT IS HEREBY ORDERED** that:

1. Within 5 days of this Order, Plaintiffs shall file an Original, executed, Second Amended Complaint, identical in all respects to the proposed Second Amended Complaint attached to this stipulation as **Exhibit A**, and shall serve the same by U.S. Mail or personal service separately upon David J. Libowsky, Esq., and Marc A. Al, Esq.

2. Effective immediately, the caption of this matter shall be modified to that set forth above.

3. Defendant Hold Brothers' Motion to Compel Arbitration of All Claims Against it and to Stay Litigation Pursuant to the Federal Arbitration Act Or, in the Alternative, To Compel Arbitration of Plaintiff Morris's Claims and to Stay All Other Litigation Pending the Morris Arbitration Or, in the Alternative, To Dismiss Plaintiff JC Enterprises, Inc. from this Action and To Dismiss or Strike Plaintiffs' Punitive Damages Demand shall be deemed filed in response to Plaintiffs' Second Amended Complaint.

4. Hold Brothers' counsel shall file a letter with the Clerk of Court, together with two copies thereof, indicating which portions of its Motion to Compel Arbitration, etc., have been rendered moot as a result of the filing and service of Plaintiffs' Second Amended Complaint.

5. Plaintiffs shall serve any pleadings responsive to Defendant Hold Brothers' Motion to Compel Arbitration, etc., by June 6, 2002, and shall file such responsive pleadings immediately, the provisions in Rule 7.1 notwithstanding.

6. Defendant Hold Brothers shall serve any reply pleadings in support of its Motion to Compel Arbitration, etc., by June 20, 2002, and shall file such reply pleadings immediately.

7. As a result of Plaintiffs' filing of their Second Amended Complaint, Defendants Paul Hutchins and Gary Miller are effectively, and are hereby, dismissed from this action, without prejudice, leaving only Defendant Hold Brothers On-Line Investment Services Inc.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

**BY THE COURT:**

Dated: May 23, 2002

By ______________________
Hon. Richard H. Kyle
United States District Judge

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**
**FIFTH DIVISION**

---

**James Broughton and Cheri Morris, Individually and as Members of JC Enterprises of Minnesota, LLC; and JC Enterprises of Minnesota, LLC, a Minnesota Limited Liability Company,**

**Plaintiffs,** **Civil File # 01-1128 RHK/SRN**

**vs.**

**Jury Trial Demanded**

**Hold Brothers On-Line Investment Services Inc., a Delaware Corporation,**

**Defendant.**

---

## SECOND AMENDED COMPLAINT

**JURISDICTION and VENUE**

1. This Court has diversity jurisdiction to hear plaintiffs' Complaint pursuant to 28 U.S.C. Section 1332. All plaintiffs are citizens of the State of Minnesota. The defendant Hold Brothers On-Line Investments Services, Inc., upon information and belief, is incorporated in the State of Delaware, with its principal place of business located in Jersey City, New Jersey. Jurisdiction of this Court also arises under the Federal Securities Exchange Act of 1934, 15 U.S.C. 78a, et seq. ("the Exchange Act") and the Federal Securities Act of 1933, 15 U.S.C. 77a, et seq. ("the Securities Act"). Venue is proper in that the acts complained of and the damages thereby incurred by the plaintiffs occurred primarily in the city of Minneapolis, Minnesota. The matter in controversy exceeds the sum of $75,000, exclusive of interest and costs.

**PARTIES**

2. Plaintiff JC Enterprises of Minnesota, LLC, is a limited liability company duly licensed in the State of Minnesota. At all times pertinent to this Complaint its principal place of business was in Minneapolis. James Broughton (Broughton) and Cheri Morris (Morris) are the only members of JC Enterprises.

3. Defendant Hold Brothers On-Line Investments Services Inc., (On-Line) is, upon information and belief, a Delaware corporation with its principal place of business at Jersey City,

EXHIBIT A

New Jersey. Hold Brothers On-Line Investments Services, Inc., is, upon information and belief, (a) the successor in interest to the company previously known as On-Line Investment Services, Inc., and (b) is a broker/dealer engaged in the purchase and sale of securities, duly licensed pursuant to pertinent federal securities laws and regulations, and a member of the National Association of Securities Dealers.

**FACTS**

4. On or about September 10, 1997, the plaintiffs and a Texas limited liability company known as Wise Consulting signed a contract annexed hereto as Exhibit A and made a part of this Complaint. Upon information and belief, the members of Wise consulting were two individuals named Paul Hutchins and Gary Miller, both Texas residents at the time. Upon information and belief, Gary Miller is currently an employee of the defendant On-Line and a resident of the state of New Jersey.

5. To secure the contract with the plaintiffs, Wise Consulting represented itself as purveyors of expert advice in the establishment and operation of that portion of the securities industry known as "daytrading." Prior to the signing of the agreement, Wise was made fully aware that plaintiffs had no experience in the securities industry or in daytrading but would rely on the advice of Wise with respect to the plaintiffs' investment in the prospective business. For its services, Wise was to receive a fixed percentage (10%) of the commissions earned by JC Enterprises as a result of JC's ownership of a daytrading "branch office". The contract further provided that the plaintiffs could not disclose the fact that it had a contractual relationship with Wise unless it received the permission of Wise to make the disclosure.

6. At the time the contract between Wise and JC (Exhibit A) was signed, Wise operated a "branch office" of a broker/dealer firm called Block Trading, and the original intention of the parties to the Wise-JC contract was that JC would become another "branch office" of Block.

7. In November 1997 Morris and Broughton accompanied by Wise, and acting upon the advice of Wise, began the negotiations with Block that the plaintiffs expected would lead to a contract permitting the plaintiffs to operate their own Block "branch office."

8. While the JC-Block negotiations continued, but before a JC-Block contract was signed, Wise advised the plaintiffs that (1) there would be no difficulty in negotiating a final contract with Block and (2) that therefore the plaintiffs should immediately prepare for the opening of a Minneapolis "branch office" of Block Trading.

9. Acting upon the "expert" advice of Wise, the plaintiffs proceeded to hire personnel, sign a lease for office space, and lease or purchase the sophisticated computer hardware and software required for the establishment of a daytrading "branch office." Each such expenditure was made upon the specific advice of Wise.

10. During the month of January 1998 the plaintiffs were informed that Block Trading could no longer supply the technological support for a new "branch office," and that therefore Block could not agree to any contract with the plaintiffs.

11. Upon information and belief, during this same time period, various disputes arose between Block Trading and the owners of several already-established "branch offices," including the Atlanta office owned by Wise. Wise, as the owner of a threatened Block office, and as a representative of other Block offices, sought a new relationship for the purpose of continuing to operate a daytrading firm, and began to negotiate such an arrangement with the defendant On-Line.

12. In its role as "expert advisor" to Morris, Broughton and JC Enterprises, Wise advised the plaintiffs to join the group that proposed to establish itself as On-Line branch offices. Wise then acted as JC's agent in negotiating the terms of the contract between JC and On-Line (Exhibit B), and subsequently acted as JC's "consultant" in the establishment and operation of the Minneapolis "branch office" of the defendant On-Line.

13. Unbeknownst to the plaintiffs, On-Line and Wise had a separate and undisclosed business relationship with each other, and that relationship materially affected the terms of the subsequent contract between On-Line and JC Enterprises in a manner substantially detrimental to the interests of the plaintiffs.

14. The contract between JC and On-Line (Exhibit B) was negotiated In March 1998 at a meeting between Morris, Wise Consulting, and officers of On-Line, held at the On-Line offices in Jersey City, New Jersey. Morris, on behalf of JC Enterprises, agreed to an arrangement whereby

JC Enterprises and On-Line would engage in the business of providing services to individuals in the Minneapolis area who wished to engage in the electronic day trading of registered securities.

15. Unlike traditional "brokers" (defined by the Exchange Act as, "any person engaged in the business of effecting transactions in securities for the account of others..."), the parties to the March meeting in New Jersey did not plan to solicit customers for particular investments or provide investment advice. Unlike traditional "dealers" (defined by the Exchange Act as, "any person engaged in the business of buying and selling securities for his own account"), neither the plaintiffs nor defendants planned to cooperate with each other to establish a joint inventory of securities and to trade as principles.

16. Rather, the intended purpose of the proposed business association was to provide the means by which individual investors who wished to purchase or sell securities could deal directly with an opposite number to arrange their own transactions, thus avoiding large commissions and mark-ups ordinarily charged by traditional brokers and/or dealers.

17. For its part, JC Enterprises agreed to (a) open a Minneapolis office, (b) furnish the substantial capital required to lease or purchase the sophisticated computer hardware and software needed for electronic day trading, (c) to outfit and staff its Minneapolis office, (d) to pay a start-up fee to On-Line of $1000, (e) to pay On-Line an hourly fee for the use of On-Line employees as needed, (f) to use On-Line Investments as the name of the Minneapolis office, and (g) to execute all trades of its customers through On-Line.

18. The function of On-Line was (a) to provide its name and reputation to the Minneapolis business and (b) to supply so-called "back-room" activities. That is, although computerized day trading represents an entirely new way for investors to communicate, once the communication is complete and the trade is made, the traditional methods of recording the transaction must be employed. On-Line was to receive the electronic information from each computer in the Minneapolis office, execute the particular trade through its clearing agent, Southwest Securities of Austin, Texas, and attend to the necessary bookkeeping.

19. For its services, On-Line charged a fee to the investor, and agreed to pay a portion of that fee to the Minneapolis "branch office" to be owned by JC Enterprises. This fee represented the entire projected income of JC Enterprises, and was intended to pay for all of JC's capital

investment, office expenses, and whatever profit JC Enterprises could realize on its substantial investment. As will be shown below, Wise in turn was to receive a percentage of the fee earned by JC Enterprises.

20. Although On-Line and JC Enterprises established what was primarily a new communication service that allowed investors to become their own brokers and/or dealers, the resulting purchase and sale of securities, plus the required "old-fashioned" back-office functions by On-Line and Southwest Securities, meant that both On-Line of New Jersey and the Minneapolis office needed to comply with all federal and state securities laws and the rules of the National Association of Securities Dealers. The most significant of these requirements was that the Minneapolis office be managed by a properly licensed registered representative - in this case the holder of what is known as a "Series 24 license."

21. On-Line represented to JC Enterprises that although JC Enterprises was the de facto owner of the Minneapolis office, and although JC Enterprises supplied all of the risk capital for the venture with On-Line, the Minneapolis office would have to be denominated a "branch office" of On-Line, and the only contractual relationship consistent with such a denomination would have to be between On-Line and the manager of the "branch office."

22. In reliance upon the good faith and fair dealing of On-Line, JC Enterprises agreed to fund the "branch office" and to depend upon the contract between On-Line and the "branch manager" for the income JC Enterprises hoped would result from its relationship with On-Line.

23. In March 1998, On-Line, Morris, and one John Logan signed a contract whereby Logan became the "branch manager" of the Minneapolis office. The On-Line-Morris-Logan contract is annexed hereto as Exhibit B and made a part of this Complaint.

24. Pursuant to the contract On-Line maintained control of all key operational functions of the Minneapolis office, which was to do business under the name of "On-Line Investment Services, Inc.". For example, the hiring of all registered personnel and all advertising and marketing activities of the Minneapolis office required the approval of On-Line. The Minneapolis office could process the orders its customers placed for the purchase or sale of securities only through On-Line in New Jersey and On-Line's clearing agent, Southwest Securities, in Texas.

25. Under the terms of its agreement with On-Line, JC Enterprises was to supply all of the start-up and operating capital of the Minneapolis office, to deposit $30,000 in its On-Line "error account," pay $1000 to On-Line as a start-up fee, and to pay a set hourly fee for time spent by On-Line's New Jersey employees in the establishment and/or operation of the Minneapolis office.

26. In recruiting JC Enterprises for the expansion of its electronic day-trading network, On-Line persuaded the plaintiffs to accept a contract that (a) ostensibly complied with the legal obligation to have the Minneapolis office "managed" by the holder of a Series 24 license, and (b) therefore did not accurately reflect the agreement between the plaintiffs and On-Line, to wit:

> A. The contract expressly stated that it was John Logan, the manager, who was "desirous of opening" the office, whereas the plaintiffs and defendants knew and agreed that it was the plaintiffs, not Logan, who desired to open the Minneapolis office;
>
> B. The contract stated that it was Logan who was to assume personal responsibility for all expenses associated with opening and operating the office, whereas the plaintiffs and the defendants knew and agreed that it was the plaintiffs, not Logan, who were to assume that responsibility;
>
> C. The contract provided only that On-Line would share its commissions with Logan and did not specifically entitle the plaintiffs to receive any benefit whatsoever from their investment in the Minneapolis office, whereas both the plaintiffs and the defendant knew and agreed that it was the plaintiffs who were entitled to the profits, if any, from the JC Enterprises-On-Line agreement.

27. Following the agreement between On-Line, Logan, and JC Enterprises, the plaintiffs made all the arrangements necessary to open the Minneapolis office, which began to service its customers in May 1998. During the course of the following 18 months, On-Line failed to keep <u>any</u> of its promises to JC Enterprises, specifically:

A. On-Line failed to respond to queries or pleas for help from the Minneapolis office and failed to give the guidance it had promised to support the business of the plaintiffs;

B. On-Line failed to keep accurate records of customer accounts, especially margin accounts, thus causing the plaintiffs to lose a substantial number of those customers;

C. On-Line kept inaccurate records of network expenses attributable to the Minneapolis office, thus over-charging the plaintiffs for their true portion of such expenses;

D. On-Line wrongfully attributed commissions rightfully earned by the Minneapolis office to other On-Line "branch offices," thus depriving the plaintiffs of income they had honestly earned;

E. Commission payments that were sent to the Minneapolis office invariably were not made in a timely fashion, thus permitting On-Line to profit from the "float" while depriving the plaintiffs of needed cash flow and increasing the cost to the plaintiffs of their debt service.

F. On-Line failed to supply to the Minneapolis office the computer software it had promised, thus depriving the plaintiffs of the opportunity to operate the business profitably and to expand it as contemplated by the original agreement with the defendants.

G. On-Line failed to keep accurate records of the plaintiffs' "error account," and kept a portion of the amount deposited in that account for its own use, whereas such funds rightfully belong to the plaintiffs.

28. In April, 1999, the defendant On-Line effectively terminated the plaintiffs' contract, thus forcing the "branch office" out of business and causing the plaintiffs to lose their entire investment in the enterprise and the profits they would have made but for On-Line's breach of its agreement as aforesaid, and its breach of its statutory and fiduciary duties to the plaintiffs.

**WHEREFORE**, the plaintiffs claim the following relief:

A. That the Court adjudge and decree that the Minneapolis office of On-Line Investments, Inc., was a "franchise" as defined and regulated by Section 80C.01 ff of the Minnesota Statutes and that the defendant On-Line (1) failed to register as a franchisor as mandated by the Minnesota Statutes, (2) failed to disclose to the plaintiffs the information required by Minnesota law, (3) failed to comply with the duties and responsibilities of a franchisor to a franchisee as set forth above, and (4) failed to provide proper notice to the plaintiffs of On-Line's intention to terminate the plaintiffs' franchise.

B. Alternatively, that the Court adjudge and decree that the defendant engaged in unfair and inequitable practices as defined by Section 80c.14 of the Minnesota Statutes and the rules and regulations promulgated thereunder insofar as the defendant (1) mis-represented to the plaintiffs the nature of their respective enterprises, (2) mis-represented the nature of On-Line's obligations to the plaintiffs, (3) mis-represented the nature of the benefits the plaintiffs could reasonably expect to derive from their association with the defendant, and (4) conducted its relationship with the plaintiffs in a manner so negligent as to virtually assure that the plaintiffs would be forced out of business.

C. Alternatively, that the Court adjudge and decree that the Minneapolis "branch office" of the defendant On-Line was a "security" as defined by Section 78c of Title 15 of the United States Code (the Exchange Act), and as defined by the Minnesota Blue Sky Laws (Chapter 80A of the Minnesota Statutes Annotated), and that the defendant On-Line (1) failed to properly register the security with the appropriate state and federal authorities, (2) failed to disclose the true nature of the investment made by the plaintiffs in the Minneapolis "branch office," and (3) fraudulently withheld information material and necessary to enable the plaintiffs to make an informed decision with respect to their investment in the security.

D. That the Court adjudge and decree that the plaintiffs were the true parties in interest in the Contract annexed hereto as Exhibit B and that the defendant On-Line breached said contract in the manner specified above.

E. That the Court adjudge and decree that the defendant On-Line breached its fiduciary duty to the plaintiffs and its duty of good faith and fair dealing, either as a franchisor of the plaintiffs, issuer of a security purchased by the plaintiffs, or party to a contract between the plaintiffs and the defendant On-Line.

F. That the Court grant judgment for the plaintiffs against the defendant for compensatory damages, interest and attorneys fees in an amount to be proven at trial but in no case less than $75,000 exclusive of interest and attorneys fees.

G. That the Court grant to the plaintiffs such other and further relief as to this Court seems just and proper.

## JURY DEMAND

Plaintiff demand a jury trial of all issues so triable herein.

Dated:

By: ______________________________

**Joseph Dicker**
**Attorney for the Plaintiffs**
**1406 West Lake Street**
**Minneapolis, MN 55408**
**Phone: 612-827-5941**

By ______________________________

**Donald E. Grossfield**
**Attorney for the Plaintiffs**
**165 N. Water Street**
**Rochester, NY 14604**
**Phone: 716-423-0787**

EXHIBIT A

## DAYTRADING CONSULTING AGREEMENT

This is a consultant services agreement between James E. Broughton and Cheri A. Morris, referred to in this Agreement as "Client," and WISE CONSULTING GROUP, LLC, 2416 Trophy Drive, Plano, Texas 75025, referred to in this Agreement as "Consultant." Client is a individuals [type of entity], and Consultant is a Texas partnership. Client and Consultant are collectively referred to in this Agreement as the "Parties."

### Recitals

1. Client desires to:

(a) Open a daytrading office for the purpose of allowing traders to trade for their own accounts directly with the exchanges, and for this office to be part of a larger network of daytrading offices in which Client's office will be a branch; and

(b) Obtain Consultant's advice concerning the opening and successful operation of the daytrading office.

Client accepts Consultant, as an expert for the purposes of providing the consultation required by this Agreement.

### Consultation Services

2. (a) WISE CONSULTING GROUP, LLC, agrees to act as Consultant and to advise Client with respect to the opening and operation of the daytrading office. The Parties agree that any written or oral consultant provided by Consultant is advisory, involving Consultant's judgment based on education and experience, and that there is no guarantee of any particular result from the consultation.

(b) The consultation to be performed pursuant to this Agreement includes the following:

(1) Implement the timeline, which Consultant has developed to accomplish the

steps necessary in opening of a successful daytrading office.

(2) Make Consultant's database available to Client of the companies and individuals who will provide assistance in the development of the daytrading office.

(3) Utilize Consultant's marketing plan in coordination with the timeline.

(4) Provide all manpower resources needed to complete the marketing strategy for the daytrading office.

(5) Advise and provide assistance in the ordering of all necessary furniture and data processing equipment.

(6) Assist in the hiring and training of two NASD licensed employees, which must be hired by Client.

(7) Assist in the initial site location, advise on appropriate buildout needs and lease terms, and review any and all lease documents where necessary.

(8) Assist in procuring one or more existing daytraders, utilizing Consultant's internal network of successful daytraders throughout the country to periodically provide visiting daytraders on a rotating basis through the office.

(9) Make available and utilize Consultant's other Block Trading Office locations for training of employees and traders prior to and after the opening of the office.

(10) Make available trader training either in Consultant's Block Trading Office locations or on site at Client's daytrading office, prior to the opening of the office and thereafter on an as needed basis.

**Independent Contractor Status**

3. Client and Consultant agree that Consultant shall perform its duties under the Agreement as an independent contractor. The Consultant is not to be deemed an employee of Client, and

Consultant shall not have or claim any right arising from employee status. Consultant has the sole discretion to determine the manner in which the consultation services are to be performed, and Consultant expects full cooperation from Client in carrying out the terms of this Agreement.

**Materials**

4. Except for services that must be performed on or with Client's computers or Software, Consultant shall provide materials used in performing the services described in this Agreement, and it is understood and agreed that all such materials are the property of Consultant.

**Consultations**

5. (a) Consultation shall be orally communicated between Consultant and ______________ [name of designated employee(s)] when appropriate. On Client's request, Consultant shall prepare any reports or other written documents that are mutually agreed upon. Consultation may be made in person between Consultant and ___________ [name of company's designated employee] when mutually convenient and mutually agreed upon.

(b) Client agrees to provide Consultant with access to Client's personnel, and computer hardware, software, and other equipment that is necessary to enable Consultant to perform its duties under this Agreement.

**Compensation**

6. (a) Consultant shall be paid at the rate of 10% of the gross ticket margin on an ongoing basis. Gross ticket margin is defined as the gross commission after clearing.

(b) The compensation will be paid by Client to Consultant on a monthly basis and under the same payment schedule, which exists with the Broker/Dealer. Client agrees to reference this Agreement within the agreement which client has with the Broker/Dealer.

(c) Consultant shall have the right to look at the books and records of Client during normal business hours at those times determined by Consultant at its sole discretion.

**Expenses**

7. Client shall reimburse Consultant for expenses that are reasonably incurred by Consultant in the performance of this Agreement. Such expenses shall include all direct costs associated with marketing, including without limitation actual advertising costs, and actual travel costs; and all direct costs associated with training, including without limitation actual training fees, and actual travel costs.

**Confidentiality of Relationship**

8. The Parties acknowledge and agree that the fact that Client is using Consultant's services is confidential. No part of this Agreement may be disclosed by either party unless it has been approved by the other party's written permission.

**Termination of Contract**

9. This Agreement may be terminated at any time by Consultant by giving Client ninety (90) days written notice of termination. Notice of termination shall be deemed effective on its receipt by the other party. On Termination of this Agreement, Consultant shall have no further obligation to provide services for Client.

**Assignment of Contract**

10. Neither of the Parties may assign this Agreement or any rights under the Agreement.

**Governing Law**

11. The Parties agree that this Agreement has been made in Texas and that it shall be governed by and construed pursuant to the laws of the State of Texas. Venue for any litigation brought pursuant to this Agreement shall be in Collin County, Texas.

**Entire Agreement**

12. This Agreement is the complete and exclusive statement of the mutual understanding of the parties. This Agreement supersedes and cancels all previous written and oral agreements and communications between the Parties relating to the consultant services that are the subject matter of this Agreement.

**Notice**

13. Any notice required or permitted by this Agreement shall be deemed to have been completed if in writing and delivered personally or mailed by first-class, registered, or certified mail, postage prepaid to the other party at the addresses set forth above.

**Attorney's Fees**

14. If any legal action is necessary to enforce the terms of this Agreement, the prevailing party shall be entitled to reasonable attorney's fees in addition to any other relief to which that party may be entitled.

**Severability**

15. If any court of competent jurisdiction determines that any part of this Agreement is invalid or unenforceable, that determination shall not impair or nullify the remained of this Agreement.

**Amendment**

16. The Parties agree that they may amend this Agreement only by a written agreement duly executed by persons authorized to execute agreements on behalf of the Parties.

Executed at PLANO, Texas on September 10, 1997.

CLIENT

James E. Broughton Cheri A. Marris

[Name of client]

By: James E. Broughton Cheri A. Marris

[signature]

CONSULTANT

WISE CONSULTING GROUP, LLC

By: P.R. Hutchins

Paul R. Hutchins, President

EXHIBIT B

# MINNEAPOLIS, MINNESOTA BRANCH OFFICE MANAGEMENT AGREEMENT

Agreement made as of the 30th day of March 1998 between On-Line Investment Services, Inc. (the "Company") with offices at One Exchange Place, Suite 900, Jersey City New Jersey 07302 and John R. Logan (the "Manager"), who resides at 5220 West 102nd Street, Apt 319, Bloomington, Minnesota, 55437.

The Company is registered as a securities broker/dealer with the Securities and Exchange Commission (the "SEC") and is a member of the National Association of Securities Dealers, Inc. (the "NASD"). The Company is engaged in the retail securities business and desires to expand such business. The Manager is a registered representative and, if required, shall be, on or before the Effective date, a registered securities principal. The Manager is desirous of opening and managing a retail securities branch office for the Company in Minneapolis, Minnesota.

In consideration of the foregoing and the promises contained herein, the parties hereto agree as follows:

1. Definitions: For the purposes of the non-competition covenants of this Agreement, the term SOES ("SOES Trading") shall refer to the NASD Small Order Execution System, NASD SelectNet execution system, any NEXT Nasdaq system, Nasdaq Integrated Order Delivery and Execution System, or any execution system that is a successor to the aforementioned execution systems. SOES ("SOES Trading") shall also refer to any combination of executions done on he aforementioned execution systems, any NASDAQ limit order book or automated execution systems implemented by NASDAQ. The term Dot ("Dot"), as used in this Agreement, shall refer to the New York Stock Exchange Dot system or any successor execution system implemented by the various exchanges thereafter. "Competition" as the term is utilized in this Agreement shall mean engaging in the retail brokerage business utilizing SOES Trading, Dot, or any successor or combination of execution systems implemented by the various exchanges thereafter, but shall not mean engaging in a general retail brokerage business in a major retail brokerage firm.

2. Position. The Company hereby appoints and the Manager hereby agrees to be appointed as the branch office manager of a branch office of the Company to be established at 5001 West 80th Street, Suite 600, Bloomington, MN 55437 (the 'Minneapolis Branch Office").

3. Term. This Agreement is for a term of 24 months from the date hereof (the "Term") and shall be automatically renewed every two years unless written notice of non-renewal is served by either party at least 90 days prior to the end of any two year Term or unless terminated earlier as provided in this Agreement.

4. Duties. The Manager shall perform all of the duties typically performed by a branch office manager of a retail securities firm including, but not limited to: (i) the hiring, supervising and firing of all office personnel, including registered personnel; (ii) office compliance with applicable rules (as such term is defined in Paragraph 11d hereof) as well as compliance with Company policies and procedures; and (iii) the maintaining of all books and records required to be maintained by a branch office under the rules and regulations from time in effect which are promulgated by the SEC, the NASD or other self regulatory organizations with jurisdiction over the Company and any other federal, state or local authority with jurisdiction over the Branch Office.

5. Office of Supervisory Jurisdiction; Staffing.

a) The Manager understands that the Company, pursuant to the NASD Rules of Fair Practice, Article III, Section 27, will designate the Branch Office as an office of supervisory jurisdiction in the event it is required to do so under such rule. The Manager agrees that he shall be directly responsible, in the first instance, for the review of the activities of registered representatives and persons associated with the Company in the Office.

b) The Company shall employ no fewer than one registered representatives and will employ a second registered representative within 45 days of the execution of this Agreement.

c) The Manager understands and acknowledges that no person may be paid any commission income who is not appropriately registered with the company's self regulatory organization (currently the NASD) and is not employed by the Company.

6. Limitations on Management Authority. The following limitations are hereby imposed on the manager's authority with respect to the Branch Office:

a) The Manager is not authorized to commit the Company's funds or to bind the Company to any contract without receiving the prior written approval of Gregory Hold, the Chief Executive Officer of the Company;

b) The Manager is not authorized to recommend, or permit any person or persons under his supervision to recommend, any prolonged or continued volume accumulation of securities without receiving the prior written approval of Gregory Hold, the Chief Executive officer if the Company;

c) The Company must give its prior written approval for the hiring of all registered personnel;

d) The Company must give its written approval for all advertising or marketing materials prior to their distribution or use.

7 Purchase and Sales Orders. All orders taken by personnel in the Branch Office must be transmitted to the Company's Jersey City, NJ office for execution. Any exception to this policy must be approved in advance by the President of the Company. No purchase or sale transaction may be accepted unless sufficient funds or equity to consummate the transaction are in the account for which the order is being taken.

8. Financial Responsibilities for Branch Office. The Manager agrees to bear complete financial responsibility for the operation of the Branch Office ("Branch Expenses"), such responsibility to include, but not be limited to, the following:

a) All expenses of operating the Branch Office, including rent, telephones, cost of lines and equipment to connect the Branch Office to the Company's principal office, cost of stock quotation service for the Branch office, utilities, equipment, supplies, insurance and any other expenses incurred in connection with such operation;

b) The Manager shall be liable for the employment costs of all personnel employed at the Minneapolis Branch Office, including but not limited to, salaries, taxes (including but not limited to payroll taxes), bonuses, benefits (including but not limited to health insurance) and registration and CRD charges associated for all Branch Office personnel. Employee charges at the Company's principal office that will not be charged to the Minneapolis Branch Office include, as based upon the technological capability of the branch: sending trades to the clearing firm, utilizing the news department, basic communication with the P&S department research (inasmuch as the Minneapolis Branch Office cannot technologically conduct on it's own), preparing the branch's monthly statement, and very basic technical advisory services. To the extent that such personnel are requested by the Minneapolis Branch office or necessitated because, at the discretion of the Company, their non-utilization threatens the well-being of the Company, the Minneapolis Branch Office shall incur charges associated with such personnel for the duration of such support as per Schedule X (attached);

c) The Branch Office's pro rata share of material upgrades to the Company's computer network not covered by Order Routing Charges in Paragraph 8(g), whether specifically or partially dedicated to the Branch Office, equal to a fraction, the numerator of which equals all transactions effected for the Branch Office accounts in the immediately succeeding month and the denominator of which equals the total number of transactions for the Company as a whole in such month.

d) All costs or expenses of compliance violations, litigation and regulatory investigations related to the Branch Office, including, but not limited to, attorneys' fees and expenses, fines and judgments;

e) All debit balances in customers accounts and the costs associated with collecting those debit balances;

f) The Manager shall be liable for all other extraordinary costs incurred in connection with the Company's clearing agreement which are attributable to the Minneapolis Branch Office, including but not limited to customer wire transfer fees, SEC investigation charges, etc., but not to include the basic Nasdaq clearing charge, included in the ticket fee;

g) The Manager shall be responsible for the charge for processing trades in the amount of the applicable base charge per order ticket as set forth on the charts below plus any additional fees charged in the customer's commission (or absorbed by the Branch Office) for transactions effected on Nasdaq, an exchange, or a proprietary execution system (the "Ticket Fee")

i) The cost per ticket (Nasdaq Day Trade) is as follows:

ON-LINE's TICKET FEE*:

| Daily share Volume | Cost per share: |
|---|---|
| 0-1,250,000 | $.00450 per share |
| 1,250,001+ | $.00425 per share |

SOFTWARE CHARGES:

TradeCast cost:

TBD

ORDER ROUTING CHARGE:

Plus $.00025/share

* If on Instinet,
Done through Southwest
Securities, then these charges
Plus $.012/share.

The order routing charge ("Order Routing Charge") shall include Schedule X fees as associated with the maintenance of the order server, NASDAQ logins at the Company's Main Office related to ordering, NQDS equipment and maintenance inasmuch as ordering is involved, all licenses regarding the order and Sequel server, and network upgrades inasmuch as they involve the order routing hardware.

ii) The cost for DOT orders shall be as follows*:

| Daily share volume: | Cost per share | Software cost: | Order Routing charge: |
|---|---|---|---|
| 0-1,250,000 | $.00450 per share | TBD | plus $.00025 per share |

1,250,001+ $.00425 per share

For Dot orders routed through Southwest Securities, including orders done through Momentum Trade software, the per share cost will be $.00450 for 2000 share orders or less. For 2001 shares and more, the cost shall be $.015 per share for a market order, and $.02 per share for a limit order for the entire order, without a base charge.

Charges for Dot orders executed through ABN-AMRO/Chicago Corp. software or any other third party execution service will be passed through to the Minneapolis, Minnesota Branch Office. The charge from the Company for these orders shall be the base charge of $.00450/share. As of this writing, ABN-AMRO/Chicago Corp orders are charged at $.00875/share for orders up to 2099 shares or executed in 120 seconds or less, and $.0125/share for orders of 2100 shares or more or executed in more than 120 seconds.

*If listed trades are done on AXIS, then these rates plus $.01/share

iii) The costs for options contracts are $7.25 per ticket, and $1.75 per contract.

The Company does not represent that any present or future relationship with any of its software providers is perpetual, and the Manager acknowledges that software vendors may refuse or discontinue business with On-Line. Additionally, the Company does not warrant that these software fees are perpetual, and agrees to notify the Minneapolis Branch Office Manager if such change occurs.

It is understood by the Manager that included in these fees are clearing costs but these fees does not include the expenses of running a branch which include, but are not limited to: SelectNet charges, NASDAQ execution and cancel charges, rents, ECN charges, SEC fees and chargebacks, deposits, salaries (both of Branch Office personnel and those Company personnel utilized by the Branch Office, as defined in Paragraph 8b), Schedule X charges, Schedule Y charges, equipment purchased or leased, lines, subscriptions, taxes, regulatory fees, and other charges incurred by the Branch Office.

For the purposes of this clause only, the term SOES ("SOES") shall be defined as the NASD's current Small Order Execution System. SelectNet ("SelectNet") shall be defined as the NASD's current SelectNet execution system. The Manager agrees that following any successor or combination of execution systems implemented by the various exchanges thereafter, the terms of Paragraph 8(g) may be renegotiated.

h) The cost of Nasdaq equipment and service utilized by the Company for the Branch Office. The obligation of the Manager for the cost of such Nasdaq equipment and service shall survive the termination of this Agreement and terminate at the earliest date when termination of the contract is permitted by Nasdaq; and

i) The Manager shall pay a pro rata share of all costs of national and applicable regional advertising incurred by the Company after the Effective Date, not to exceed $.00025 per share. The Manager's pro rata share shall be calculated by multiplying total national advertising costs incurred in any month after the Effective Date by a fraction, the numerator of which equals the number of transactions effected at the Branch Office in the immediately preceding calendar month and the denominator of which equals the total number of transactions effected by the entire Company in the immediately preceding calendar month. The Company will give the Manager 10 (ten) days notice in advance of all pending national and applicable regional advertising efforts, which the Manager shall have the right to exclude himself from by writing to the Company at least 5 (five) days prior to the date that such effort is to begin.

j) To the extent the foregoing expenses are start-up or one time expenses, such as equipment, CRD charges, Nasdaq and communication line installation charges and deposits and the like, the Manager shall forward payment thereof upon receipt of written advice from the Company as to the charges in respect thereof. To the extent the foregoing expenses are of an ongoing nature, such as payroll, taxes, stock quotation services and the like, the Company shall pay all of the foregoing costs and expenses and such amounts shall be deducted from Monthly Gross Revenue in the calculation of the Manager's Compensation, all as set forth and defined in Paragraph 9 below.

k) In addition to the foregoing, the sum of $30,000 shall be placed into an account at the clearing firm, to be designated as the Minneapolis Branch Office Error Account ("Error Account").

The total liabilities generated by the Branch Office will be continually tabulated, and if the sum of the total amount of liabilities plus forty percent (40%) of that amount (i.e., 140% of the total monthly liabilities) is greater than the amount in the Minneapolis Error Account plus commission accruals, the difference will be withheld from the Monthly Gross Revenue and added to the Error Account.

The Maintenance Level ("Maintenance Level") shall be defined as the level below which the Branch Manager must receive the permission of the Company for any use of the Error Account.

The amount of $30,000 shall be designated as the Maintenance Level. Net debit activity in the Error Account shall require additional funding of the Error Account in the amount of such net debit activity. Such funding will be above and beyond accrual funding and will be required to the extent that the Error Account is less than $30,000. Upon termination of this Agreement pursuant to Paragraph 19, the Company may offset against amounts in the error account any amounts owing to the Company by the Minneapolis Branch Office hereunder. Upon the termination of the Agreement and payment of all amounts owing to the Company hereunder, including, but not limited to, amounts owing pursuant to subparagraph 8(g) hereof,

any amount retained in such error account after a final accounting for the Branch Office shall be remitted to the Manager

l) In addition to the foregoing, the Manager shall, simultaneous with the Manager's execution of this Agreement, pay to the Company a deposit of $1000 (of which actual amount will be determined by applying Schedule X and other charges) to reimburse the Company for costs of opening the Branch Office, including, but not limited to, obtaining all regulatory approvals and qualifying the Company to do business in the State of Minnesota. For training the Manager in the operations of the Company and the Branch Office, on-site training of staff in use of equipment and operation of office, and training of employees engaged by the Company to service the Branch office, Schedule X shall apply. Such payment for use of the Company's personnel, as defined in Schedule X, is not refundable.

9. <u>Compensation to Manager.</u>

a) The Manager shall receive from the Company all of the "Monthly Gross Revenue", as hereinafter defined, generated by the Minneapolis Branch Office (i) less the Ticket Fee and (ii) less the Branch Expenses (the "Manager's Compensation"). The Manager shall be paid on or before the 15th day of the month for the Monthly Gross Revenues generated in the immediately preceding month.

b) The term "Monthly Gross Revenues" as used herein shall mean all commission revenue generated during a month through the efforts of the Branch Office personnel and received by the Company prior to the last Thursday of the immediately succeeding brokerage month.

10. <u>Customer Complaints.</u> The Manager shall promptly inform the Company by telephone (and confirmed in writing sent by telephone facsimile) of any customer complaints, whether written or oral, as set forth in the Branch Procedures section of the Company's Compliance Manual. If such complaints are in writing, copies of the complaint shall be provided to the Company by telephone facsimile simultaneous with the manager's transmission of notification of the complaint. The Manager shall have the responsibility to resolve all customer complaints arising out of the Branch Office and the financial responsibility to bear the entire cost thereof. The Company reserves the right, in its sole discretion after due diligence and 30 days written notice, to settle any complaint and charge the Manager with all of the costs of any such settlement, including attorneys, fees and disbursements, if any. Such a decision will be made following consultation with the Branch Manager and will be made in a prudent manner.

11. <u>Representations of Manager</u>. The Manager represents, warrants and covenants to the Company as follows:

a) The Manager personally guarantees that he will, in fact, be the acting Manager

of the Minneapolis Branch Office. He additionally warrants that no other party, individual, company, or agent will assume the position of or act as the Manager of the branch without the written approval of the Company. In the event that another party other than the undersigned manager assumes the responsibilities of Branch Manager without the express written consent of the Company, the Company will have the right to terminate this agreement at will;

b) That he is duly licensed as a registered representative with the NASD and is not currently and has never been subject to a suspension or limitation on his ability to act as a registered representative;

c) That, if required, on or before the forty-fifth day after the date hereof he will be licensed as a general securities principal; with the NASD and will not be subject to a suspension of that license;

d) That he is fully familiar with all rules, regulations, and statutes of all state and federal agencies which regulate securities markets as well as the constitution, rules, by-laws, regulations and customs of all applicable securities markets, associations, exchanges and clearing houses (hereinafter collectively referred to as the "Applicable Rules") and will fully comply therewith;

e) That he has read and understands the Company's policies and Compliance Manual and will fully comply therewith;

f) That he will devote his best effort and attention to the management of the Branch Office.

g) That he is not a party to any agreement preventing the execution by him of this Agreement or the fulfillment by him of his obligations hereunder.

12. Representations of the Company. The Company represents and warrants to the Manager as follows:

a) That it is a member in good standing with the NASD;

b) That it is duly registered as a broker/dealer with the SEC and in the State of New Jersey.

13. Indemnification. The Manager hereby agrees to indemnify, defend and hold the Company harmless from any loss, damage, claim, cost and reasonable attorneys fees and disbursements arising out of his management of the Branch Office or his breach of this Agreement. For the purpose of this Agreement, the term "cost" shall mean expenses including but not limited to, rent, utilities, furniture and equipment expenses, and other unpaid obligations incurred by the Manager.

14. Benefits. The Manager will not be entitled to participate in any employee benefit programs of the Company as may from time to time be in effect unless specifically agreed to in writing. The foregoing notwithstanding, the Minneapolis Branch Office shall be required to maintain and fund the premiums for health insurance for its employees, as well as any insurance required by applicable state law, such as workers' compensation insurance, as required by law.

15. Non-Competition Covenants.

a) The Manager acknowledges that the Company's Customers, as hereinafter defined, are a valuable, special and unique asset of the Company's business. For the purposes of this paragraph, the term "Customer" refers to individuals, entities, and individuals acting on behalf of entities (i) who are Customers at the time of the Manager's termination ("Termination"), (ii) who were Customers of the Company within a year prior to Termination, and also refers to any accounts owned or controlled, directly or indirectly, by a Customer. Customers of the Minneapolis Branch Office are not excluded from the definition of "Customers" as used in this provision.

b) During the Term of this Agreement, and for a period of one year after, the Manager agrees that he shall not:

(i) Solicit or accept business which is competitive with the business of the Company ("Business") from any Customer of the Company, otherwise than on behalf of the Company;

(ii) Induce or attempt to induce any Customer to limit such Customer's business with Company, by direct advertising or solicitation;

(iii) Disclose the names of any Customers to any other person or persons, whether natural persons or business entities; or

(iv) Solicit any of the employees of the Company engaged in the Business, including any individual who was an employee of the Company within one year (1 year) of the Manager's Termination, to leave the employ of the Company.

c) During the Term of this Agreement, and for a period of one year after its Termination, the Manager agrees that he will not engage or become interested, directly or indirectly, as owner, employee, officer, director, partner, through stock ownership (except ownership of less than two percent (2%) of the number of shares outstanding of any securities which are listed for trading on any securities exchange or are regularly traded by members of the NASD in over-the-counter market), or by the investing of capital, lending of money or property, rendering of services, or otherwise, either alone or in association with others, in the operation

of any type of business or enterprise within a 75 mile radius of the Minneapolis Branch Office, in any way in Competition as hereinafter defined, with the business conducted by the Company prior to the termination of the Agreement, otherwise than on behalf of the Company or any Affiliate thereof. "Affiliate", as the term is utilized in this Agreement shall mean any Company which has more than 50% of its equity owned by the Company or by persons who are beneficial owners of stock in the Company, or is controlled, by contract or otherwise, by the Company or its beneficial stockholders, controls or is under common control with the Company.

d) For the Term of this Agreement, the Company agrees that it shall not establish another Branch Office of the Company within the geographic areas of Minneapolis, Minnesota, and the surrounding areas which describe a 75 mile radius from the Minneapolis Branch Office. Upon Termination of this Agreement subject to Paragraph 19, this subparagraph 15(d) shall be deemed null and void.

"Competition" as the term is utilized in this Agreement shall mean engaging in the retail brokerage business primarily utilizing the NASD's Small Order Execution System, New York Stock Exchange Dot System or any successor thereto, but shall not mean engaging in a general retail brokerage business in a major retail brokerage firm.

16. <u>Confidential Information.</u>

a) Either during or after the term of this Agreement, the Manager will not communicate, disclose or utilize for his own benefit or the benefit of any other entity or person any techniques, plans, designs, programs, customer information or other information not in the public domain or, if in the public domain, if revealed or disclosed in contravention of this Agreement or the agreements made between the Company and other parties.

b) Upon termination of this Agreement pursuant to Paragraph 19, the Manager agrees to promptly surrender to the Company all property purchased by the Company or produced on its behalf including all equipment and all originals and copies on any memoranda, customer lists, business manuals, programs and any other documents and material received by Manager while this Agreement is in effect and in the Manager's possession, custody or control. The Manager shall not retain or deliver to any other entity or person any of the foregoing or any summary thereof or memorandum pertaining thereto.

17. <u>Lease; Sublet or Assignment.</u> It shall be the responsibility of the Manager to enter into a lease of premises for the operation of the Minneapolis Branch Office in his own name or in the name of an entity controlled by the Manager. The Manager agrees to furnish and decorate the space in a manner appropriate to the brokerage business and reasonably acceptable to the Company.

18. Branch Office Title. The name of the Minneapolis Branch Office shall be "On-Line Investment Services Inc.," and shall be displayed prominently, with no other firm or affiliation represented. Additionally, the Manager shall additionally display the Company's NASD and SIPC affiliations in accordance with the Company's Self Regulatory Organization's (currently the NASD) rules and bylaws.

19. Termination. This Agreement shall be terminated immediately upon the happening of the earliest of the following events:

a) If the Manager fails to lease space for the Minneapolis Branch Office within thirty (30) days of his execution of the Agreement or fails to open the Minneapolis Branch Office for business within sixty (60) days of his execution of this Agreement unless such failure is attributable to a failure of the Company's self-regulatory organization to grant the necessary approvals;

b) If the Manager is not qualified as a general securities principal on or before the end if the forty-fifth day after the date of this Agreement, if such qualification is required;

c) Whenever the Company and Manager shall mutually agree to termination in writing;

d) Upon the death of Manager;

e) If the Manager incurs a disability through physical or mental incapacity which renders the Manager incapable if performing his duties under this Agreement for a period of two (2) consecutive months or an aggregate of two (2) months during any four (4) month period. If any dispute arises as to the existence of a disability under this subparagraph 19(e) above, the same shall be resolved by the opinion of two licensed physicians, one selected by the company and the other selected by the Manager. If the two physicians so selected cannot agree as to whether or not Manager is disabled, as defined herein, the two physicians so selected shall designate a third physician and a majority of the three physicians so selected shall conclusively determine whether the Manager is disabled.

f) If Manager engages in "Gross Misconduct". For the purposes if this Agreement, the term "Gross Misconduct" shall mean (i) any gross default, gross misfeasance, fraud, embezzlement or any substantial breach of non-observance of any of the covenants set forth herein; (ii) the immoderate use of alcohol on a habitual basis; (iii) the illegal use of a controlled substance on the premises of the Company or any of its Affiliates, or while engaged in any business related function which adversely affects the Manager's ability to perform services hereunder; (iv) the commission of any act of sexual or racial harassment, the violation of any federal of state securities law or any rule or regulation of the Securities and Exchange Commission, the NASD, any state securities commission or any governmental

agency or authority, or any other act having the potential to expose the Company or any of its Affiliate to civil or criminal penalties or the Manager's conviction of a felony; (v) absence from the business and affairs of the Company for any unreasonable period of time, without leave; or (vi) the willful disobedience or neglect of any of the Company's supervisory procedures, other internal policies or procedures or reasonable orders directions or the management or officers of the Company.

20. Transfer of Management Status: The Manager hereby agrees that at the sole discretion of the Company, Cheri A. Morris of 18232 Cascade Drive, Eden Prairie, MN 55347 may take over this Agreement in its entirety from the date of execution onward, incurring all obligation, duties, and responsibilities, financial, regulatory and otherwise from the date of execution of this Agreement onward. Cheri A. Morris may do this provided that:

a) she serves the Company and Manager with written notice within 90 days following the execution of this Agreement, and;

b) is duly registered with the Company and allowed to receive commission income per the guidelines of the Company's Self Regulatory Organization (currently the NASD) and able to assume all of the regulatory responsibilities of this Agreement or to provide a General Securities Principal (acceptable to the Company) who will assume them.

21. Personal Financial Guarantee: It is understood that the Minneapolis Branch Office commissions shall be netted against its' expenses, with the difference being accruals ("Accruals"). The Manager shall only be responsible for branch expenses to the extent that there are positive accruals owed to him by the Company. The Manager shall be responsible for all negative accruals generated by the Minneapolis Branch Office.

Upon execution of this Agreement, the Manager warrants to the Company his personal financial guarantee for items including, but not limited to Paragraph 8 ("Financial Responsibilities of the Branch Office), clauses a, b, d, e, f, g, h, I, j, k, and l the amount of which the Manager hereby and expressly guarantees that the validity of this Agreement and the financial obligations thereafter of the Manager shall in no way be terminated, affected, or impaired for any reason.

22. Assignability. No rights under this Agreement shall be assignable nor any duties assumed by another party, without the express written consent of the Company. The Company may assign this contract to any Affiliate provided the Company agrees to be a guarantor of the Affiliate's assumption of obligations under this Agreement.

23. Entire Agreement; Modification. This instrument contains the entire agreement of the parties hereto with respect to the subject matter hereof and supersedes all prior oral or written understandings. This Agreement may not be modified or amended except in a writing executed by the parties hereto.

24. Notices. All notices and other communications hereunder shall be in writing and shall be deemed given when delivered personally, when sent by telephone facsimile, receipt confirmed, or when mailed by registered or certified mail, return receipt requested, to the parties at their respective addresses given above or at such other address for a party as shall be specified by notice given pursuant hereto.

25. Enforcement. Both parties recognize that the services to be rendered under this Agreement by the Manager are special, unique and of extraordinary character which gives them a peculiar value. In the event of the breach by the Manager of the terms and conditions of this Agreement to be performed by him, then the Company shall be entitled to institute and prosecute proceedings in any court of competent jurisdiction, either in law or in equity, to obtain damages for any breach of this Agreement, or to enforce the specific performance thereof by Manager or to enjoin the Manager from violating Paragraphs 15 and 16. The Manager acknowledges that the Company will be irreparably damaged if he shall breach any of the terms of Paragraphs 15 and 16 and that the Company cannot be reasonably or adequately compensated in damages for any such breach. The Manager agrees that an injunction may be issued restraining any such breach by him, and the Company's rights under this paragraph shall be enforceable in a court of equity by decree of specific performance. Such remedy, however, shall not be exclusive and shall be in addition to any other remedy that the Company may have.

26. Applicable Law; Compliance. This Agreement and matters or issues collateral thereto shall be governed by and construed in accordance with the laws of the State of New Jersey applicable to agreements made and to be performed solely within such State. If any provision of this Agreement is found by a proper court to be in conflict with federal, state, or local law, regulation or ordinance, or unreasonable in any respect, then such provision shall be considered amended to that considered lawful or reasonable by the court and, as amended, shall be enforced; all remaining terms and conditions shall continue in full force and effect.

27. Waiver. No waiver of any breach of any agreement of provision herein contained shall be deemed a waiver of any preceding or succeeding breach thereof or of any other agreement of provision herein contained. No extension of time for performance of any obligations or acts shall be deemed an extension of time for performance of any other obligations or acts.

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date first above written.

ON-LINE INVESTMENT SERVICES, INC.

RITA B. .SSOON
NOTARY PUBLIC OF NEW JERSEY
Commission Expires 2/14/2002

Sworn to and subscribed before me this 2 day of April 19 98

Rita Balkissoon

By: Gregory F. Hold
Gregory F. Hold, President

RITA BALKISSOON
NOTARY PUBLIC OF NEW JERSEY
Commission Expires 2/14/2002

Sworn to and subscribed before me this 2 day of April 19 98

Rita Balkissoon

By: John R. Logan
John R. Logan, Branch Manager

By: Cheri A. Morris
Cheri A. Morris

HEATHER C. CARROLL
NOTARY PUBLIC - MINNESOTA
My Commission expires Jan. 31, 2000

April 1, 1998
Heather C. Carroll
(as to Cheri Morris)

# Schedule X

It is the understanding of the undersigned parties that On-Line Investment Services Inc. (the "Company") will be compensated for man-hours lost in the establishment and maintenance of a new branch office. It is also understood that the following rate schedule will apply to the use of the personnel of the Company by the Minneapolis Branch Office in the establishment and maintenance of the Branch Office:

| On-Line Personnel | Hourly Rate** |
|---|---|
| Technical staff | $85 |
| Compliance | $75 |
| Project Manager | $75 |
| Senior Back Office | $50 |
| Junior Back Office | $30 |
| Senior Accountant | $85 |
| Junior Accountant | $50 |
| Human Resources | $50 |
| On-Line Executive* | ? |

* This rate will apply to On-Line Executives performing functions in non-ordinary business categories.

** A 20% discount applies to these rates if a specific employee's services is used for 2 hours or more in a day. A 30% discount applies if a specific employee's services are used for 8 hours or more in a day.

ON-LINE INVESTMENT SERVICES INC.

RITA BALKISSOON
NOTARY PUBLIC OF NEW JERSEY
Commission Expires 2/14/2002
Sworn to and subscribed before me this 2 day of April 19 98

Rita Ba[illegible]

Gregory F. Hold, President and CEO

John R. Logan, Minneapolis Branch Manager

RITA BALKISSOON
NOTARY PUBLIC OF NEW JERSEY
Commission Expires 2/14/2002
Sworn to and subscribed before me this 2 day of April 19 98

Rita Ba[illegible]

Cheri A. Morris

HEATHER C. CARROLL
NOTARY PUBLIC - MINNESOTA
My Commission Expires Jan. 31, 2000

April 1, 1998
Heather C. Carroll
(as to Cheri Morris)

**Schedule Y**

The following Schedule shall reflect the costs of technological amenities offered to the Minneapolis, Minnesota Branch Office by On-Line Investment Services Inc. (the "Company") as of 1 October 1997.

| | |
|---|---|
| News Department/PA system | Included in the ticket fee |
| AutEx | $100/view/month |
| AXIS Global L.L.C. | TBD |
| Instinet Terminal | TBD |

These prices do not reflect the cost of equipment and time spent by the respective firms' proprietary technicians, consultants or the Company's personnel to set-up the hardware, etc., associated with the facilitation of receiving these amenities. Additionally, the Company shall inform the Branch Manager upon receipt of information regarding cost increases for any of the amenities. The Company only warrants and covenants that as of 1 October 1997 these costs reflect a discount or pass-through of the per unit cost of such amenities.

Other amenities, including but not limited to Bristol Insight, may be acquired by the Branch Office upon notification and subsequent approval by the President, Gregory F. Hold, in writing. Subsequent to approval and if applicable, the Company agrees to facilitate through advice or pre-existing business relationships, the best cost possible for Branch Offices to acquire technological amenities.

No services, including but not limited to software, hardware, data feeds, data lines, information providers, or other third party services of any form are guaranteed by the Company to any employee or customer, to any extent, including but not limited to accuracy, reliability, timeliness, or appropriateness.

RITA BALKISSOON
NOTARY PUBLIC OF NEW JERSEY
Commission Expires 2/14/2002
Sworn to and subscribed before me
this 2 day of April 19 98
Rita Ba[illegible]

ON-LINE INVESTMENT SERVICES INC.

Gregory F. Hold, President and CEO

RITA BALKISSOON
NOTARY PUBLIC OF NEW JERSEY
Commission Expires 2/14/2002
Sworn to and subscribed before me
this 2 day of April 19 98
Rita Ba[illegible]

John R. Logan, Branch Manager

Cheri A. Morris

HEATHER C. CARROLL
NOTARY PUBLIC - MINNESOTA
My Commission expires Jan. 31, 2000

April 1, 1998
Heather C Carroll
(as to Cheri Morris)

| | | | |
|---|---|---|---|
| te: | 5/14/98 | Time: | 3:11 PM |
| ges: | 3 | Sender: | 432 8860 |
| mpany: | | Fax Number: | |
| bject: | | Type: | Fax |



# On-Line Investment Services Inc.

MEMBER NASD SIPC

To: Cheri Morris
From: Pete Earle, General Manager, On-Line Investment Services Inc.

Re: Trade Egress at the Main Office

The following is an addendum to the Branch Management Agreement regarding executing trades through personnel through the Main Office's Instinet Terminals.

If your fax machine stamps something on top of the transmissions, please white them out and make a copy so we receive a clean version. As usual, have the appropriate signatory entities sign this document and, after notarized, send back to us. Also, be sure to put the day in the execution space on top (14th, 15th, whenever it's signed).

Thanks,

Pete Earle
General Manager
On-Line Investment Services Inc.

ONE EXCHANGE PLACE • SUITE 900 • JERSEY CITY, NJ 07302 • TEL: (201)432-8772 • FAX: (201)432-8860 • e-mail: online@onli.com

## ADDENDUM TO MINNEAPOLIS, MINNESOTA BRANCH MANAGEMENT AGREEMENT

This Addendum, executed on 15 May 1998 modifies the Agreement executed on or about the 31st day of March 1998 between On-Line Investment Services Inc. (the "Company") with offices at One Exchange Place, Suite 900, Jersey City New Jersey 07302 and John R. Logan (the "Manager"), who resides at 5220 West 102nd Street, Apt 319, Bloomington, Minnesota, 55437.

Paragraph 8(g)(i) ("Financial Responsibilities for Branch Office") of the Agreement shall be modified to read as follows:

8g) The Manager shall be responsible for the charge for processing trades in the amount of the applicable base charge per order ticket as set forth on the charts below plus any additional fees charged in the customer's commission (or absorbed by the Branch Office) for transactions effected on Nasdaq, an exchange, or a proprietary execution system (the "Ticket Fee")

i) The cost per ticket (Nasdaq Day Trade) is as follows:

ON-LINE's TICKET FEE*:

| Daily share Volume | Cost per share: |
|---|---|
| 0-1,250,000 | $.00450 per share |
| 1,250,001+ | $.00425 per share |

SOFTWARE CHARGES:

TradeCast cost:

$.00075/share

ORDER ROUTING CHARGE:

Plus $.00025/share

* If on Instinet, Done through Southwest Securities, then these charges Plus $.012/share.

If on Instinet, done through an inputter or other employee at the main offices of the Company (Suite 900, One Exchange Place, Jersey City, NJ 07302), then these charges plus $.015/share.

The order routing charge ("Order Routing Charge") shall include Schedule X fees as associated with the maintenance of the order server, NASDAQ logins at the Company's Main Office related to ordering, NQDS equipment and maintenance inasmuch as ordering is involved, all licenses regarding the order and Sequel server, and network upgrades inasmuch as they involve the order routing hardware.

The above modification does not in any way void, modify, or alter any of the other clauses of the Minneapolis, Minnesota Branch Management Agreement, which remains in full and complete effect subject to the terms and conditions as set forth in the on or about 31 March 1998 executed instrument.

ON-LINE INVESTMENT SERVICES INC.

Gregory F. Hold, President and CEO

John R. Logan

John R. Logan, Branch Manager

Cheri A. Morris

Cheri A. Morris

HEATHER C. CARROLL
NOTARY PUBLIC - MINNESOTA
My Commission Expires Jan. 31, 2000

5-15-98
Heather C. Carroll
as to John Logan

HEATHER C. CARROLL
NOTARY PUBLIC - MINNESOTA
My Commission Expires Jan. 31, 2000

5-15-98
Heather C. Carroll
as to Cheri Morris

MINNESOTA CHAPTER OF THE FEDERAL BAR ASSOCIATION

In connection with
The Federal Judiciary

## *28th Annual Federal Court Practice Seminar*

**June 19, 2002**
**8:00 am—5:15 pm**

Minneapolis Convention Center
1301 Second Avenue South
Room 208
Minneapolis, MN 55402
(612) 335-6000

**The Minnesota Chapter of the Federal Bar Association**

c/o Kelly & Berens, P.A.
80 S. 8th Street, Suite 3720
Minneapolis, MN 55402

NON-PROFIT
ORGANIZATION
U.S. POSTAGE
**PAID**
Minnespolis, MN
Permit No. 2657

**Application Pending for 7.5 CLE Credits including 2 Ethics and 1 Bias Credit**

*Featured Speakers Include:*

**District of Minnesota**

Judge David S. Doty

Judge Donovan W. Frank

Judge Paul A. Magnuson

Judge Ann D. Montgomery

Judge John R. Tunheim

Chief Magistrate Judge Jonathan Lebedoff

Magistrate Judge Arthur J. Boylan

**United States Bankruptcy Court**
**District of Minnesota**

Judge Robert J. Kressel

## Morning Session:

| | |
|---|---|
| 7:30-8:00 | **Registration** |
| 8:00-8:15 | **Opening Remarks and Welcome,** ***Judge Ann D. Montgomery*** |
| 8:15-9:00 | **Securities Law Issues in the Wake of Enron,** ***Timothy J. Warren (SEC Midwest Regional Office), Professor Niels Schaumann (William Mitchell College of Law), Karl L. Cambronne (Chestnut & Cambronne)*** |
| 9:00-9:45 | **Current Issues in Employment Law,** ***Judge Paul A. Magnuson, Linda L. Holstein (Parsinen Kaplan Rosberg & Gottlieb PA), John R. McDonald (Meagher & Geer, PLLP), Daniel Oberdorfer (Leonard, Street and Deinard)*** |
| 9:45-10:00 | **Morning Break** |
| 10:00-10:45 | **Current Initiatives in the U.S. Attorneys' Office,** ***Tom Heffelfinger (U.S. Attorneys Office)*** |
| 10:45-11:45 | **Discovery Disputes: Professionalism in the Practice of Law?,** ***Judge David S. Doty, Chief Magistrate Judge Jonathan Lebedoff, Magistrate Judge Arthur J. Boylan,*** |
| 11:45-12:45 | **Lunch (Room 211)** |

11:45-12:45 Lunch (Room 211)

## Afternoon Session:

| | |
|---|---|
| 12:45-1:30 | **The Clerk's Office Can Be Your New Best Friend,** ***Celeste Shahidi, Lou Jean Gleason, Mary Lenner, Gertie Simon, Andy Seldon*** |
| 1:30-2:15 | **How to Effectively Teach and Persuade in Patent or Intellectual Property Cases: Why, When and How,** ***Judge Donovan W. Frank, Becky R. Thorson (Robins, Kaplan, Miller & Ciresi), Stephen J. Davidson (Leonard, Street and Deinard)*** |
| 2:15-3:15 | **Issues in the Wake of 9/11: Racial Profiling --** ***Daniel M. Scott (U.S. Federal Public Defenders' Office)***; **Response by the Department of Justice --** ***Tony Brown (U.S. Attorneys Office)*** |
| 3:15:3:30 | **Afternoon Break** |
| 3:30-4:15 | **Update on Technology Tools for Litigating in Federal Court,** ***Judge John R. Tunheim, Judge Robert J. Kressel, Eric J. Magnuson (Rider, Bennett, Egan & Arundel)*** |
| 4:15-5:15 | **Ethics in "Real Life" Practice Situations,** ***Martin A. Cole (Lawyers Professional Responsibility Office)*** |

## *Seminar Registration*

| | |
|---|---|
| ☐ Member | $195.00 |
| ☐ Non-Member | $225.00 |

Name ______________________

Firm/Employer ______________________

Address ______________________

______________________

Phone ______________________

E-Mail ______________________

**Complete registration form and send with check payable to:**

**Minnesota Chapter, FBA**
**c/o Nancy Gustafson**
**Kelly & Berens, P.A.**
**Suite 3720 IDS Center**
**80 South Eighth Street**
**Minneapolis, Minnesota 55402**

**Not a Member? Join the FBA**

*To apply on-line or to download application form go to http://www.fedbar.org and click on "Join the FBA."*

Questions call: Barbara P. Berens, Vice President, Planning, Minnesota Chapter FBA
(612)-349-6171

**Annual Seminar Planning Committee:**

Kristine M. Boylan, Meagher & Geer, P.L.L.P.

Catherine A. McEnroe, Leonard, Street and Deinard

Celeste M. Shahidi, U.S. Courthouse Minneapolis Building

Susan Nolting, U.S. Department of Justice

Maureen Watz Gornik, Warren E. Burger Federal Building