**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

---

James Broughton, Cheri Morris,
and JC Enterprises of Minnesota,

Plaintiffs,

v.

Civil No. 01-1128 (RHK/SRN)
**MEMORANDUM OPINION AND ORDER**

Hold Brothers On-Line
Investment Services, Inc.

Defendant.

---

Joseph William Dicker, Dicker Law Office, Minneapolis, Minnesota and Donald E. Grossfield, Grossfield Law Office, Rochester, New York, for Plaintiffs.

Mark A. Al, Lindquist and Vennum, Minneapolis, Minnesota for Defendant.

---

## Introduction

Plaintiffs James Broughton, Cheri Morris, and JC Enterprises entered into a relationship with On-Line Investment Services, Inc. ("On-Line")[1] to open an office in Minneapolis, Minnesota to provide services to individuals wishing to engage in on-line day trading of registered securities. In connection with the relationship, Plaintiff Cheri Morris executed a Uniform Application for Securities Industry Registration or Transfer

---

[1]On-Line was originally sued as On-Line Investments, Inc., although the proper name of the entity was On-Line Investment Services, Inc. On-Line is now known as Hold Brothers On-Line Investment Services, Inc.



AUG 1 2 2002
FILED
RICHARD D. SLETTEN, CLERK
JUDGMENT ENTD
DEPUTY CLERK

(known as a Form U-4) as part of her application to the National Association of Securities Dealers ("NASD") to become an On-Line licensed representative. The Form U-4 contained an arbitration clause. In May 1998, Plaintiffs opened an On-Line branch office, and the office was closed in May 1999, after On-Line terminated its relationship with Plaintiffs. The closing of the office resulted in Plaintiffs filing a Complaint in this Court. Before the Court is On-Line's motion to compel arbitration of all claims and to stay the litigation or in the alternative, to compel arbitration of and stay Morris's claims and to stay the remaining claims. For the reasons stated below, the Court will grant On-Line's motion to compel arbitration of, and stay, Morris's claims and deny its motion to compel arbitration of, or stay, JC Enterprises and Broughton's claims.

## Background

Broughton and Morris are Minnesota residents and the only shareholders of JC Enterprises, a Minnesota limited liability company. (2nd Am. Compl. ¶¶ 1, 2.) Prior to the fall of 1997, they had no experience in the securities industry. (Id. ¶ 5.) Defendant On-Line, a Delaware corporation with its principal place of business in Jersey City, New Jersey, is a broker/dealer engaged in the purchase and sale of securities and a member of the NASD. (Id. ¶ 3; DeLeon Decl. ¶ 2.) In early 1998, Plaintiffs entered into a relationship[2] with On-Line to open an on-line day trading office in Minneapolis,

[2]The parties are described as being in a "relationship," as opposed to entering into a contract with one another because no contract was signed by the parties. As discussed below, a third person and On-Line are parties to a management agreement, which was

Minnesota. (2d Am. Compl. ¶ 12.)

## I. Form U-4

As part of the relationship with On-Line, Morris applied to NASD to become an On-Line licensed representative. NASD requires applicants to complete a Form U-4 and to pass a licensing exam in order to become licensed to sell registered securities. In March 1998, Morris executed a Form U-4. (See DeLeon Decl., Ex. 1.) Gregory Hold, a representative of On-Line, also completed and signed a section of the Form U-4 pertaining to "the firm." (Id. Ex. 1 at 4.)

On the last page of the Form U-4, the following phrase appears: "THE APPLICANT MUST READ THE FOLLOWING VERY CAREFULLY." (Id. Ex. 1. p. 4.) An arbitration clause is found in paragraph 5 of that section, which states that Morris agrees to "arbitrate any dispute, claim or controversy that may arise between me and my firm . . . that is required to be arbitrated under the rules, constitutions, or by-laws of the [NASD] as may be amended from time to time." (Id. (emphasis added).) In addition, Paragraph 2 of that section provides:

> I apply for registration with the [NASD] and, in consideration of the [NASD] receiving and considering my application, I submit to the authority of the [NASD] and agree to comply with all provisions, conditions and covenants of the statutes, constitutions, certifications

---

also signed by Morris in apparent anticipation that she would become the branch manager of the Minneapolis office. Even though the parties did not enter into a contract, they interacted with one another to open the branch office. The relationship stemming from the parties' interaction is the subject of this suit.

> of incorporation, by-laws and rules and regulations of the [NASD] as they are or may be adopted, or amended from time to time. I further agree to be subject to and comply with all requirements, rulings, orders, directives and decisions of, and penalties, prohibitions and limitations imposed by [NASD], subject to right of appeal and review as provided by law.

(Id. (emphasis added).) In some instances, NASD's rules and regulations require mandatory arbitration of claims between members and "associated persons." (See id. Ex. 4.) After executing the Form U-4, Morris failed to pass the licensing exam and thus, never became a licensed representative. (See Pls.' Mem. in Opp'n to Mot. to Compel Arb. at 3; On-Line's Mem. in Supp. of Mot. to Compel Arb. at 6.)

## II. The Minneapolis Branch Office

In the spring of 1998, On-Line and JC Enterprises negotiated the terms for the opening of a Minneapolis branch office, which was to be "de facto" controlled by JC Enterprises. (2d Am. Compl. ¶ 21.) As part of the arrangement, JC Enterprises agreed to provide the capital needed to lease the office space and purchase office equipment. (Id. ¶ 17.) In return, On-Line allowed JC Enterprises to use its name and provided it the services necessary to complete the on-line trades. (Id. ¶ 18.)

In April 1998, On-Line, Morris, and John R. Logan (a third person who is not a party to this litigation) signed a management agreement, which set out the terms for opening and operating the branch office. (Id. ¶ 20, Ex. B.) The management agreement was drafted so that it complied with applicable state and federal securities laws, including

the requirement that the branch office be managed by a licensed representative. As discussed above, Morris failed her licensing exam, and it appears that Broughton was not a licensed representative. Logan, however, was a properly licensed representative. Therefore, the management agreement was drafted such that On-Line and Logan are the parties to the agreement (Id., Ex. B. at p. 1.) The only reference in the management agreement to any of the Plaintiffs is found in paragraph 20, entitled Transfer of Management Status, which states that Logan "agrees that at the sole discretion of [On-Line], Cheri A. Morris . . . may take over this Agreement . . . " (Id., Ex. B ¶ 20.) Hold, in his capacity as On-Line's president, Logan, in his capacity as the branch manager, and Morris, apparently in anticipation that she would become the branch manager, signed the management agreement. (Id., Ex. B.) It does not contain an arbitration clause. (Id.)

In May 1998, Plaintiffs opened the Minneapolis branch office, and within one year, On-Line terminated its relationship with Plaintiffs. (Id. ¶ 27.) The branch office closed in May 1999. (Id. ¶ 28.)

**III. Procedural History**

On June 22, 2001, Plaintiffs commenced this suit, alleging violations of state franchise law and federal and state securities laws, breach of contract, and breach of fiduciary duty. On May 1, 2002, On-Line filed an Answer to an Amended Complaint, and one week later, it filed the instant motion to compel arbitration, based on the

arbitration clause contained in the Form U-4.[3] Subsequently, the Court granted Plaintiffs leave to file a Second Amended Complaint, which alleges, among other things, violations of Minnesota franchise laws, unfair trade practices, and violations of state and federal securities laws.[4] (See generally 2d Am. Compl.) In general, the allegations in the Second Amended Complaint focus on the management agreement. In addition, the allegations relate to the operation of the Minneapolis branch office and promises On-Line purportedly made to Plaintiffs. For example, Plaintiffs allege that On-Line failed to respond to their inquiries or requests for assistance, did not keep accurate records of customer accounts or commissions, did not send payments to Plaintiffs in a timely fashion, and did not provide the proper computer software. (Id. ¶ 27.)

**Analysis**

The Federal Arbitration Act (the "FAA") establishes a federal policy favoring arbitration that requires courts to rigorously enforce agreements to arbitrate. Shearson/American Express, Inc. v. McMahon, 482 U.S. 220, 226 (1987) (citations and internal quotation marks omitted). Section 2 of the FAA provides that a written arbitration agreement in "a contract evidencing a transaction involving commerce . . .

---

[3]No Amended Complaint was filed. When the motion was filed, On-Line also moved to dismiss JC Enterprises, Inc. and to dismiss or strike Plaintiffs' punitive damages demand. With the filing of the Second Amended Complaint, those motions have been rendered moot. (See Mark A. Al (counsel for On-Line) letter dated June 5, 2002.)

[4]The allegations are not described in specific counts, as is the usual practice. Rather, the allegations are contained in lettered paragraphs in the "wherefore" clause.

shall be valid, irrevocable, and enforceable . . . ." 9 U.S.C. § 2. Consideration of a motion to compel arbitration under the FAA involves a two-step inquiry: (1) whether there is a valid agreement to arbitrate between the parties and (2) whether the dispute falls within the scope of that arbitration agreement. Simitar Entm't, Inc. v. Silva Entm't, 44 F. Supp. 2d 986, 992 (D. Minn. 1999) (Erickson, Mag. J.)

In engaging in the two-step inquiry, the Court applies "ordinary state law contract principles to decide whether parties have agreed to arbitrate a particular matter." Keymer v. Management Recruiters Int'l, Inc., 169 F.3d 501, 504 (8th Cir. 1999). In this case, the Form U-4 contains no choice-of-law provision and thus, the Court must determine which state's law to apply. Plaintiffs raise the issue but do not perform any analysis. They contend that Minnesota (the residence of the Plaintiffs, the venue of the dispute, and the location where the management agreement was performed), New Jersey (the residence of On-Line and location where the management agreement was negotiated), or New York (the residence of NASD) law applies. Before turning to a choice-of-law analysis, however, a court must first decide if a true conflict exists. American Cas. Co. of Reading, PA v. Bank of Montana Sys., 675 F. Supp. 538, 540 (D. Minn. 1987) (MacLaughlin, J.). With respect to the applicability of the Form U-4 arbitration clause to Morris's claims, courts in all three states have upheld arbitration clauses in Form U-4s after issues of validity and scope, similar to the issues presented by Plaintiffs, were raised. See e.g., Ottman v. Fadden, 575 N.W.2d 593, 597 (Minn. Ct. App. 1998); Singer v. Commodities

Corp. (U.S.A.), 678 A.2d 1165, 1172 (N.J. Super. App. Div. 1996); F.N. Wolf & Co. v. Brothers, 613 N.Y.S.2d 319, 322 (N.Y Sup. Ct. 1994). Accordingly, no true conflict of law exists.

## I. Valid Agreement to Arbitrate

On-Line seeks to compel arbitration of all of the claims brought by all of the Plaintiffs and to stay the litigation based on the arbitration clause in the Form U-4 signed by Morris; in the alternative, it moves to stay the claims of Broughton and JC Enterprises pending the completion of the arbitration of Morris's claims.

The Form U-4 requires applicants to agree to arbitrate "any dispute, claim or controversy that may arise" between themselves and their "firms" and to be bound by the rules and regulations of the organization to which they are applying to be licenced. In this case, Morris applied to NASD, and On-Line completed and signed a section of her application as a member firm of NASD. NASD has adopted a Code of Arbitration Procedure requiring the arbitration of all disputes between member firms and "associated persons" arising out of the member firm's business. (Id. ¶ 4, Ex. 3.) Specifically, § 10101 provides:

> [A]ny dispute, claim, or controversy arising out of or in connection with the business of any member of the Association, or arising out of the employment or termination of employment of associated person(s) with any member . . . (b) between or among members and associated persons.

(Id. ¶ 4, Ex. 3 (emphasis added).) In addition, § 10201 of the Code of Arbitration Procedure provides for mandatory arbitration in some cases:

> (a) [A] dispute, claim or controversy eligible under [§ 10101] between or among members and/or associated persons . . . arising in connection with business of such member(s) or in connection with the activities of such associated persons(s), or arising out of the employment or termination of employment of such associated person(s) with such member, shall be arbitrated under this Code, at the instance of:
>
> * * *
>
> (2) a member against a person associated with a member . . .

(Id. Ex. 4 (emphasis added).) NASD's By-Laws define "associated person" to include: (2) a . . . branch manager of a member; or other natural person occupying a similar status or performing similar functions, or a natural person engaged in the investment banking or securities business who is directly or indirectly controlling or controlled by a member, whether or not any such person is registered or exempt from registration with the NASD under these By-Laws or the Rules of the Association." By-Laws of NASD, Article I, subd. dd. (emphasis added). Plaintiffs argue that Morris is not an associated person because she never passed the licensing exam and thus, never became the branch manager. While it is true that Morris did not pass her licensing exam and did not become the branch manager, she nonetheless occupied a position similar to a branch manager. Thus, under NASD's By-Laws, she is an "associated person."

Plaintiffs oppose On-Line's motion to compel on three main grounds. They assert that On-Line is not a party, nor even a third-party beneficiary, to the agreement and

therefore, cannot enforce it. The Form U-4 anticipates a relationship between Morris and On-Line. In fact, Gregory Hold of On-Line completed and signed a section of Morris's Form U-4. In addition, Morris agreed to be bound by the rules of NASD, which allow arbitration between members and associated persons. As discussed above, On-Line is a member of NASD, and Morris is an associated person. While it is technically true that On-Line is not a party to the Form U-4, it "was adopted as a broader effort by self-regulatory organizations, including the NASD, to regulate the securities industry." In re the Prudential Ins. Co. of Am. Lit., 133 F.3d 225, 230 (3d Cir. 1998) (citations omitted). Many plaintiffs have raised similar standing arguments, and courts have routinely rejected them. See e.g., id. (holding security firm had standing to compel arbitration even though it was not a signatory to the Form U-4); Stone v. Pennsylvania Merchant Group, Ltd., 949 F. Supp. 316, 321 (E.D. Pa. 1996) (determining that security firm had standing as a third-party beneficiary to enforce arbitration clause in Form U-4); Johnson v. Piper Jaffray, Inc., 515 N.W.2d 752, 755 (Minn. Ct. App. 1994) (finding that Form U-4 required plaintiff to arbitrate claims between herself and her employer, a security firm). The Court finds that On-Line has standing to enforce the arbitration clause because the clause itself contemplates an express and unequivocal intent of Morris to arbitrate her claims with her firm, that is, with On-Line.

Plaintiffs also argue that the arbitration clause is not valid because it does not show that the parties intended the clause to apply even if Morris failed her exam. The language

of the Form U-4 and NASD's regulations, however, provides otherwise. The Form U-4 states that Morris agrees "in consideration of the [NASD] receiving and considering [her] application," to be bound by NASD's regulations, which in turn contemplate claims by persons "whether or not" they are registered with NASD. When faced with this issue, other courts, including the Minnesota Court of Appeals, have held that the Form U-4 constitutes a valid agreement, regardless of whether the applicant passes the licensing exam. See e.g., Johnson, 515 N.W.2d at 755; Herko v. Metro. Life Ins. Co., 978 F. Supp. 141, 147 (W.D.N.Y. 1997); Cherry v. Wertheim Schroder and Co., Inc., 868 F. Supp. 830, 835 (D.S.C. 1994); Foley v. Presbyterian Ministers Fund, 1992 WL 63269 at * 1 (E.D. Pa. 1992). The Form U-4 was executed as part of the consideration for Morris's application and was not contingent on her passing the licensing exam. Thus, Plaintiffs' argument is without merit; the arbitration clause is valid despite the fact that Morris failed her exam.

Finally, Plaintiffs argue that the arbitration clause does not apply to the present dispute because NASD's rules only apply to traditional employer/employee disputes. NASD's rules were changed in 1993 after the Supreme Court's decision in Gilmer v. Interstate/Johnson Lane Corp., 111 S. Ct. 1647 (1991), to require arbitration of employment disputes between member firms and associated persons. The 1993 amendment was an addition to, not a substitute for, the prior rule that allowed business disputes to be arbitrated. See § 10101 of NASD (allowing arbitration of disputes

involving the "business of any member of the Association, or arising out of the employment . . ."); Thomas James Assoc., Inc. v. Jameson, 102 F.3d 60, 64 n.1 (2d Cir. 1996) (explaining the purpose of the 1993 amendment). This argument also is without merit. Accordingly, the Court determines that the Form U-4 arbitration clause is a valid, binding agreement to arbitrate.

## II. Scope of the Arbitration Clause

The Court next must determine whether the parties agreed to submit their present claims to arbitration. In doing so, it must maintain "a healthy regard for the Federal policy favoring arbitration," and adhere to the Supreme Court's instruction that "any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration." Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp., 460 U.S. 1, 24-25 (1983).

### A. Morris's Claims

By signing the Form U-4, Morris agreed to "arbitrate any dispute, claim or controversy" between herself and On-Line that is required to be arbitrated by NASD's rules. (See DeLeon Decl. Ex. 1.) NASD's rules provide that associated persons and members agree to arbitrate "any dispute, claim or controversy arising out of or in connection with the business of any member of the association." (See id. Ex. 3.) Because Morris is an associated person and On-Line is a member of NASD, the issue before the Court, then, is whether the claims in the Second Amended Complaint "arise

out of or in connection with" On-Line's business.

All of the allegations in the Second Amended Complaint involve the opening and operation of Plaintiffs' branch office, which occurred after Morris signed the Form U-4. That opening contemplated that Morris would be the branch manager, assuming she passed the licensing exam. In order to take the exam, she signed the Form U-4 and agreed to arbitrate disputes "in connection with" On-Line's business. The phrase "in connection with" is similar to the phrase "or relating to" that is used in other arbitration clauses. The Eighth Circuit has described the "or relating to" phrase as broad and determined that it covers "collateral disputes that relate to the agreement containing the clause." Fleet Tire Serv. of North Little Rock v. Oliver Rubber Co., 118 F.3d 619, 621 (8th Cir. 1997). The opening of the branch office is connected with the Form U-4 because the parties assumed Morris would become the branch manager. As such, Morris's claims in the Second Amended Complaint fall within the scope of the arbitration clause. Thus, Morris will be compelled to arbitrate her claims against On-Line.

**B. JC Enterprises and Broughton's Claims**

In certain circumstances, a non-signatory to an arbitration agreement can be bound to it under traditional principles of contract law. See Restatement (Second) of Contracts § 19. On-Line seeks to compel arbitration of JC Enterprises and Broughton's claims, asserting that the two defendants are bound to the arbitration clause in Morris's Form U-4 under the doctrine of equitable estoppel. Under that doctrine, the Court must consider the

parties' conduct after the contract was executed to determine whether the non-signatory embraced and benefitted from it.[5] See E-I DuPont de Nemours & Co. v. Rhone Poulenc Fiber & Resin Intermediates, S.A.S., 269 F.3d 187, 200 & n.7 (3d Cir. 2001).

The Eighth Circuit Court of Appeals and the Minnesota Court of Appeals have addressed the applicability of the doctrine of equitable estoppel to arbitration clauses in two related Minnesota cases. See Dominium Austin Partners, LLC v. Emerson, 248 F.3d 720, 728 (8th Cir. 2001); Dominium Austin Partners, LLC v. Lindquist, 2001 WL 950085 at * 7 (Minn. Ct. App. August 21, 2001). In Emerson, the defendants asserted counterclaims against the plaintiffs that treated all the plaintiffs as if they were signatories to the contract at issue. Emerson, 248 F.3d at 728. The contract at issue contained an arbitration clause. Id. Later, when the plaintiffs attempted to compel arbitration of the defendants' counterclaims, the defendants argued that they could not be bound to arbitrate their claims against those plaintiffs who were not signatories to the contract. Id. The Eighth Circuit, affirming the district court's decision to compel arbitration, stated, "[i]t

[5]Non-signatories can also be bound as third-party beneficiaries to a contract. That theory looks to the intentions of the parties at the time the contract was executed. DuPont, 269 F.3d at 200, n.5. To the extent JC Enterprises and Broughton seek standing as third-party beneficiaries to the Form U-4 and management agreement, On-Line asserts that the arbitration clause can be enforced under third-party beneficiary principles. JC Enterprises and Broughton have not made any argument that they are third-party beneficiaries to the Form U-4. Moreover, On-Line "expressly denies" that JC Enterprises and Broughton are third-party beneficiaries to the Form U-4 or the management agreement. (On-Line's Mem. in Supp. of Mot. to Compel Arb. at 10.) Therefore, the Court will not enforce the arbitration clause under this theory.

would be inequitable to allow [defendants] to claim that [plaintiffs] are liable for failure to perform under the contract and at the same time to deny that [plaintiffs] are contractual parties in order to avoid enforcement of the arbitration clause." Id. In Lindquist, the court relied upon Emerson and explained that the equitable estoppel doctrine "may compel arbitration for non-signatories when (a) a signatory's claim 'makes reference to or presumes the existence of the written agreement' containing the arbitration clause; or (b) the claim involves a close relationship between signatory and non-signatory parties, raising 'allegations of substantially interdependent and concerted misconduct.'" Lindquist, 2001 WL 950085 at *7 (quoting Grigson v. Creative Artists Agency, LLC, 210 F.3d 524, 527 (5th Cir. 2000)).

On-Line contends that JC Enterprises and Broughton should be bound to the arbitration clause because they based their claims on the "breach of the very agreement which required all benefitted parties to execute a Form U-4." (On-Line's Mem. in Supp. of Mot. to Compel Arb. at 11.) On-Line's argument is flawed. No section of the management agreement requires the execution of any Form U-4's. Moreover, while they may have embraced the management agreement, JC Enterprises and Broughton never benefitted from or embraced Morris's Form U-4.

There is little case law discussing, much less supporting, On-Line's contention that a non-signatory should be bound to an arbitration clause that is not referenced in the agreement forming part of the basis for the non-signatory's claims. On-Line refers to

International Paper Co. v. Schwabedissen Maschinen & Anglagen GmbH, 206 F.3d 411 (4th Cir. 2000), which is cited in DuPont, in support of its proposition that Plaintiffs cannot embrace and then deny a contract containing an arbitration clause. In that case, the Fourth Circuit affirmed the district court's ruling, which compelled the arbitration of the plaintiff's claims. International Paper, 206 F.3d at 418. The plaintiff in International Paper based all of its claims on a contract between the defendant and a third party. Id. The court noted that the plaintiff's "entire case hinges on its asserted rights under the . . . contract; it cannot seek to enforce those contractual rights and avoid [the arbitration clause.]" Id. JC Enterprises and Broughton have not based any of their allegations on the Form U-4. Furthermore, unlike the parties in International Paper, the non-signatory parties here have not benefitted from Morris's Form U-4, the contract containing the arbitration clause, during the lifetime of the contract. See DuPont, 269 F.3d at 200, n.6 (discussing International Paper).

Finally, in DuPont, on which On-Line relies, the Third Circuit declined to compel arbitration of the non-signatory's claims because the claims were "far enough removed from" the agreement containing the arbitration clause. Id. at 202. In DuPont, the defendants and a subsidiary of the plaintiff had entered into a contract that contained an arbitration clause. Id. at 191. When the plaintiff (the parent of the subsidiary) sued the defendants, they moved to compel arbitration based on the contract between the defendants and the subsidiary. Id. The court rejected the defendants' argument that the

plaintiff should be bound to the arbitration clause under the doctrine of equitable estoppel. Id.

The reasoning in DuPont is persuasive. In this case, JC Enterprises and Broughton's claims are too far removed from the arbitration clause to invoke the doctrine of equitable estoppel. Furthermore, they have neither embraced nor benefitted from Morris's Form U-4. Thus, the Court will deny On-Line's motion to compel arbitration of JC Enterprises and Broughton's claims.

## III. Stay of the Proceedings

Section 3 of the FAA provides:

> If any suit or proceeding be brought in any of the courts of the United States upon any issue referable to arbitration under an agreement in writing for such arbitration, the court in which such suit is pending, upon being satisfied that the issue involved in such suit or proceeding is referable to arbitration under such an agreement, shall on application of one of the parties stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement, providing the applicant for the stay is not in default in proceeding with such arbitration.

9 U.S.C. § 3 (emphasis added).

### A. Morris's Claims

On-Line has moved to stay Morris's claims pending the outcome of the arbitration. Once a Court has determined that a dispute falls within the scope of an arbitration agreement, the proceedings in the case relating to that arbitrable dispute must be stayed pending the completion of arbitration. See 9 U.S.C. § 3 (using "shall"); Houlihan v.

Offerman & Co., 31 F.3d 692, 695 (8th Cir.1994); Simitar Entm't, 44 F. Supp. at 997. Accordingly, the Court will stay Morris's claims pending the outcome of the arbitration.

### B. JC Enterprises and Broughton's Claims

On-Line moves, in the alternative, to stay JC Enterprises and Broughton's claims pending the outcome of Morris's arbitration. A district court has discretion to stay litigation among nonarbitrating parties pending the outcome of the arbitration. Moses H. Cone., 460 U.S. at 20 n.23; Acgrow Oils, L.L.C. v. Nat'l Union Fire Ins. Co. of Pittsburgh, P.A., 242 F.3d 777, 782-83 (8th Cir. 2001) (noting in footnote 5 that while the circuits agree that district courts have discretionary power to order a stay, the circuits disagree over whether this power arises under 9 U.S.C. § 3 or under the doctrine of abstention).

When considering whether to issue a stay, the Eighth Circuit has instructed district courts to weigh (1) the risk of inconsistent rulings; (2) the extent to which the parties will be bound by the arbitrators' decision; and (3) any prejudice that may result from delays in proceeding with the litigation. Acgrow, 242 F.2d at 783. In All Saint's Brands, Inc. v. Brewery Group Denmark, A/S, 57 F. Supp. 2d 825 (D. Minn. 1999) (Mason, Mag. J.), this Court denied a defendant's motion to stay the claims of nonarbitrating parties, explaining that granting a stay would "frustrate the expeditious resolution of this litigation" and would "adversely impact the Plaintiff." All Saint's, 57 F. Supp. 2d at 830. The court also noted that a denial of a stay was appropriate because the motion for a stay

could have been made much earlier, not all of the parties were parties to the arbitration agreement, and not all of the issues raised in the litigation were governed by the arbitration agreement. Id.

On-Line seeks a stay because Morris's arbitrable claims "involve the exact same questions of law and fact" as are involved in JC Enterprises and Broughton's claims. (On-Line's Mem. in Supp. of Mot. to Compel Arb. at 12.) While the arbitration may well address all of the issues pending before the Court, that arbitration would not be binding upon JC Enterprises and Broughton. See International Bhd. of Elec. Workers, Local No. 265 v. O.K. Elec. Co., Inc., 793 F.2d 214, 216 (8th Cir. 1986); see also Teamsters Local Union No. 764 v. J.H. Merritt & Co., 770 F.2d 40, 42 (3d Cir. 1985) (explaining that arbitration is a matter of contract, and parties are bound by arbitration awards only if they have agreed to arbitrate a matter). Therefore, the arbitration will not resolve any of JC Enterprises and Broughton's claims. In addition, this case has already languished in the court system for some time – it was commenced in June 2001, and an answer was not filed until May 2002. Any further delay would only serve to frustrate any hope of "expeditious resolution of this litigation" and would needlessly waste the Court's resources. Accordingly, On-Line's motion to stay JC Enterprises and Broughton's claims will be denied.

**Conclusion**

Based on the foregoing, and all of the files, records and proceedings herein, **IT IS**

**ORDERED** that Defendant's motion to compel arbitration of all claims and to stay the litigation or in the alternative, to compel arbitration of Morris's claims and to stay the remaining claims (Doc. No. 11) is **GRANTED IN PART**;

1. Defendant's motion to compel arbitration of and stay Morris's claims in this action is **GRANTED**.
2. Defendant's motion to compel arbitration of, or stay, JC Enterprises and James Broughton's claims in this action is **DENIED**.
3. The Court directs Defendant to file an Answer to the Second Amended Complaint within ten (10) days from the date of this Order.[6]

Dated: August 12, 2002

RICHARD H. KYLE
United States District Judge

[6]In light of this Order, the Court directs the parties to renew their settlement discussions and to report the status of those discussions to Magistrate Judge Nelson.